INDIANAPOLIS DAIRYMEN'S CO-OP., INC., ET AL V. BOTTEMA ET AL.

[No. 28,369. Filed May 21, 1948.]

*Davis, Baltzell, Hartsock & Dongus,* of Indianapolis, for appellants.

*Joe Rand Beckett, Charles K. McCormack, Irving M. Fauvre* and *Michael L. Fansler,* all of Indianapolis, for appellees.

EMMERT, C. J.—This is an appeal from an interlocutory order of the trial court appointing a receiver for the Indianapolis Dairymen's Cooperative, Inc. *pendente lite.* On June 27, 1946, the appellees, "for and on behalf of themselves and all other members of said association, the Indianapolis Dairymen's Cooperative Inc. and all others in a similar position," filed a complaint for an accounting and an immediate appointment of a receiver. Notice was given appellants that hearing on the appointment of a receiver would be had four (4) days

later, at which time the hearing was begun. The hearing required part of six (6) days and was concluded on September 16, 1946. Thereafter on November 6, 1946, the appellees filed an amended complaint for a receiver pending the action, an accounting, and an injunction against certain alleged improper expenditures. On November 22, 1946, the appellants filed their demurrer to the amended complaint, alleging there was a defect in the parties defendant in that "there are members and directors of the defendant, Indianapolis Dairymen's Cooperative Inc., who are not parties plaintiff and who have not been made parties defendant," and that several causes of action have been improperly joined. On August 5, 1947, the appellants filed a verified motion for further hearing on the application for appointment of a receiver.

Subsequently the court overruled appellants' demurrer to the amended complaint, and appellants' motion for further hearing. On September 15, 1947, the court appointed a receiver for the appellant corporation.

The amended complaint alleged that the plaintiffs were members of the Indianapolis Dairymen's Cooperative, Inc., which had over 1500 members, and was organized under the Co-operative Marketing Act of 1925 and acts amendatory thereto (Chapter 20, Acts 1925, § 15-1601 *et seq.*, Burns' 1933), and that plaintiff sued in behalf of themselves and all other members in a similar situation. It alleged that the defendant Carl Hedges was the manager, and Sam R. Hollingsworth, Newton Godsey and John Thomas were acting as directors.

The gravamen of the amended complaint was mismanagement in various particulars. It was alleged in substance that annual reports had not been filed with the

Secretary of State, the corporation had failed to hold annual meetings, and had failed to make reports to its members as required by law, and had failed to give its members proper notice of such meetings as were held; that in 1938 the corporation had accumulated a fund of $146,821.47, which was larger now, and that it had failed to distribute net income in excess of proper reserves to the members; that a large number of withdrawing members had not been paid their interest in the funds upon withdrawal as members, which would "seriously embarrass" the corporation if all such claims were presented at once and subject it to a multiplicity of suits.

The amended complaint further alleged that the corporation was deducting an unauthorized one cent (1c) per hundred pounds of milk from the producing members in violation of the marketing contract between the members and the corporation, which deduction was used for advertising not expended under the management of the corporation, and that one and one-half cents (1½c) per hundredweight of milk was being paid to the Indianapolis Sales Association, Inc., in which the defendant Carl Hedges was interested, which payment was an "unnecessary expense"; that during a long period of time the Office of Price Administration (hereafter referred to as the OPA) had fixed the price of milk at three dollars and fifty-one cents ($3.51) per hundredweight for milk testing four per cent (4%), and that the defendants had paid the members much less than said prices less the five cents (5c) per hundredweight deduction authorized by the producers contracts.

It was also alleged that for several years the corporation had failed to have a fair election of directors; that the manager Carl Hedges had refused to call a meet-

ing of the members for the purpose of discussing the affairs of the corporation, that he had refused to supply the plaintiffs with the names of the present board of directors or the members, and that he had refused to furnish a copy of the articles of incorporation and the by-laws of the corporation; and that the plaintiffs were prevented from calling a special meeting of the members because they could not obtain a membership list.

It was asserted that the corporation had acquired breeding farms, and that association funds have been improperly used to finance the accounts of distributors and purchase of cattle by individuals, and that an accounting was necessary to determine all unauthorized expenditures. The plaintiffs prayed for the appointment of a temporary receiver to conduct an election by the members and operate the business until properly elected officers could take charge, and that the defendants be required to make a complete accounting, that judgment be had for such amounts as found due plaintiffs, and that an injunction be issued against continuing improper expenditures.

The evidence introduced during the hearing was both oral and documentary, and in such cases this court will not weigh the evidence on appeal. *Strebel* v. *Bligh* (1915), 183 Ind. 537, 109 N. E. 45. In this case the appointment of a receiver was ancillary to other relief, so the sufficiency of the complaint in the main action can not be tested by demurrer to defeat the ancillary relief. *West* v. *Reeves* (1934), 207 Ind. 404, 407, 190 N. E. 431, 193 N. E. 375.

The complaint is sufficient at this stage of the proceedings if it alleges a reasonable probability of ultimate success upon the trial of the main action. *Ratcliff* v. *Ratcliff* (1942), 219 Ind. 429, 437, 39 N. E. 2d 435. But as to the ancillary relief,

"Before the court of equity should reach out its strong arm and appoint a receiver for property, facts must be alleged showing sufficient grounds and necessity therefor." *Polish National Alliance* v. *Hyzy* (1936), 210 Ind. 619, 622, 4 N. E. 2d 544. The fact that it may be assumed that the plaintiff may be able to state facts in a complaint to justify ultimate relief after a trail on the main cause does not relieve the plaintiff from stating a cause for the appointment of a receiver. "While, however, the allegations in the application for a receiver may be supplemented and enlarged by affidavits and oral testimony, yet the appointment can not be sustained if the allegations fail to show statutory or equitable grounds upon which it may stand." *Sellers* v. *Stoffel* (1894), 139 Ind. 468, 39 N. E. 52.

The fact that the application for a receiver may be enlarged to some degree by the testimony does not dispense with the pleading of some cause for a receiver either as provided by the statute or under the general principles of equity.

". . . But the court will look to the complaint, and test its sufficiency in so far as it relates to the appointment of a receiver, whether the appointment be as an auxiliary to an action, or whether the suit is being prosecuted for the sole purpose of appointing a receiver. There must be some application filed on behalf of the party seeking the appointment of a receiver and invoking the powers of the court to be exercised in that behalf. He must map out some form of pleading stating a cause for the appointment of a receiver, that the opposite parties may know on what grounds the right to a receiver is claimed, and that they may know what they have to meet and defend against to prevent the appointment, and the pleadings in this behalf will bound and limit the inquiry. *Steele* v. *Aspy, Admr.*, 128 Ind. 367." *Supreme Sitting of the Order of the Iron Hall* v. *Baker* (1892), 134 Ind. 293, 305, 33 N. E. 1128.

Nor does an application for the appointment of a receiver relieve the plaintiff of the burden of proof on that issue. *Royal Academy of Beauty Culture* v. *Wallace* (1948), Post, 383, 78 N. E. 2d 32.

The defendant is not placed in a position where it must appear and show cause why a receiver should not be appointed, for this would be relieving the plaintiff of the burden of proof. See *Nottebaum* v. *Leckie* (1929), 31 F. 2d 556. In this case the burden of proof is upon the plaintiff to prove by a fair preponderance of the evidence that a receiver should be appointed under the equitable rules in such cases. 14 C. J., § 3201, p. 971; 19 C. J. S., § 1482, p. 1193.

Even though the discretion of the trial court will not be disturbed on appeal in doubtful cases, yet when it is determined from an examination of the application and the evidence most favorable to the plaintiff, that there has been no cause either alleged or proved for the appointment of a receiver, the order must be reversed on appeal. The general principles have been summarized by one noted authority as follows:

> "The power of appointment is a delicate one, and to be exercised with great circumspection. Indeed, the courts have held repeatedly that the power to appoint a receiver should be exercised with great care and the utmost caution and only in case of an emergency, and in a clear case, or in a case of 'extreme necessity,' where it appears that the appointment is necessary either to prevent fraud or to save the property from injury or threatened loss, or destruction, and more especially is this true where the corporation is solvent, or the defendant corporation is a bank. This is the rule with respect to injunctions; it applies a fortiori with respect to the appointment of a receiver.
>
> "The same rules are enunciated in Pomeroy's Equity Jurisprudence (4th Ed.) § 1484 et seq., where it is said that the power should be exer-

cised with great caution and never indulged unless the danger of loss or injury is imminent. 'A receivership is not a panacea for all business ills. The remedy may be worse than the disease. Even the suggestion of a receivership, as all know, may cause capital to hide in its shell.' As one court has expressed it: 'A receivership is the most drastic remedy and the most expensive luxury known to the realm of the law.' " 16 Fletcher, *Cyc., Corporations* (Perm. Ed.) § 7697, pp. 90-93.

There was no allegation or proof that the corporation was dissolved, or was insolvent, or in imminent danger of insolvency, or had forfeited its corporate rights, which might have entitled the plaintiffs to a receiver under the fifth clause of § 3-2601 Burns' 1946 Repl. (Acts 1881 (Spec. Sess.) ch. 38, § 245, p. 240). In fact the complaint was that the corporate reserves were too large, and should have been distributed to the various members. The contention is that a receiver was properly appointed under the inherent equitable powers of the trial court "where, in the discretion of the court, or the judge thereof in vacation, it may be necessary to secure ample justice to the parties." cl. 7, § 3-2601 Burns' 1946 Repl., *supra*. This court has recognized that such inherent powers do exist under this provision. *Royal Academy of Beauty Culture* v. *Wallace, Post; Mead* v. *Burk* (1901), 156 Ind. 577, 581, 582, 60 N. E. 338.

The articles of incorporation of the Indianapolis Dairymen's Cooperative, Inc. provided that no stock be issued, as was authorized by ch. 20 of the 1925 Acts, so in this case the rights of the members will be treated as if they had been stockholders in a stock corporation. The plaintiffs were members of a self organized "Producers Committee" which in May, 1946, demanded that the defendant Carl Hedges secure from the OPA an increase price of four dollars and fifty cents ($4.50)

per hundredweight of milk for milk having a 3.5 per cent butter fat base instead of the OPA authorized price of three dollars and fifty-one cents ($3.51) per hundredweight of 4 per cent butterfat base.

The first written demand upon the manager Hedges requested a 3.5 per cent butterfat base in this area and four dollars and fifty cents ($4.50) per hundredweight to pay the cost of production; also, a list of the directors and a copy of the "constitution" and by-laws of the corporation. One letter from a member of the committee stated its purpose was to obtain a reasonable price and fair basic test for whole milk, and that the member "would greatly appreciate the honor of either joining in a milk strike or helping to massacre the whole — O.P.A." Hedges did ask for an authorized 3.7 per cent butterfat base and an increase in price of one cent (1c) per quart to the retail purchaser. It is obvious that neither Hedges nor any of the appellants were in any position to usurp the function of the OPA, and set the price demanded by the appellees. If stockholders or members of corporations could throw a corporation into receivership because the OPA refused to raise the price of their products, the courts would have been swamped with receivership proceedings, and this form of private enterprise operated by the courts through receivers instead of by the rightful owners. The fact that the OPA refused to change the price schedule or butterfat basis was no cause for the appointment of a receiver.

The articles of incorporation are a matter of public record in the office of Secretary of State, and so were available for examination by any member of the corporation. There was no duty on the part of the corporation nor any officer or employer thereof to furnish such copy to any plaintiff. A copy

of the by-laws could have been obtained by mandamus proceedings. *Chas. Hegenwald Co.* v. *State, ex rel.* (1925), 196 Ind. 600, 149 N. E. 170, 43 A. L. R. 775. Nor is a refusal to allow the stockholders to examine the books ground for the appointment of a receiver, "since there are other adequate remedies, such as by mandamus." 16 Fletcher, *Cyc. Corporations* (Perm. Ed.) § 7729, p. 168.

The failure of the corporation to file its annual reports with the Secretary of State does not *ipso facto* forfeit the corporate charter or revoke its right to do business. Until the state takes some action for the default in filing annual reports, corporate rights are unaffected. Even if the state commences proceedings to forfeit the charter and revoke the corporation's rights to do business, the defaulting corporation has the right to file its delinquent reports, either before or after the hearing before the Securities Commission, and thereupon proceedings are vacated or dismissed. §§ 3 and 4 of ch. 146 of the 1943 Acts, § 25-412 and § 25-413 Burns' 1933 Supplement. On August 7, 1946, the corporation did file all reports from 1938 to 1945 inclusive. The state did not act in this case, and the delinquency in filing annual reports is no grounds for the appointment of a receiver. Therefore it is unnecessary to consider the reasons given by the officers for the failure to file such report.

Chapter 151 of the 1939 Acts, § 6 (§ 15-1611 Burns' 1933 Supplement) placed restrictions upon extension of credit to any officer, director, manager or employee of any cooperative. Appellant corporation did in some instances purchase cows and take title by bills of sale, and then sell the cattle to some of the members upon conditional sales contracts. Such sales were made to two former directors, Webb and Godsey, but at the time

of the hearing all the cattle had been paid for in full, either by cash or by withholding deductions from the producer's milk checks. If it be assumed that the legislature under the police power had authority to amend the Agriculture Co-Operative Act and restrict the corporation's rights to contract with its own officers and directors, there is no showing that the corporation was harmed in any way in this case. Since the debts had been fully paid, the conditional sales were closed transactions, and afforded appellees no ground for the appointment of a receiver. There is no evidence of any other extension of credit to any officer, director, manager or employee of the association.

Chapter 20 of the 1925 Acts authorizing the incorporation of cooperatives granted very broad powers to such organizations.[1] The operation of a breeding farm was obviously within its powers.

Appellees' brief does not show other unauthorized extension of credit to members.

---

[1] "Sec. 4. Purposes. An association may be organized to engage in any activity in connection with the marketing or selling of the agricultural products of its members, or with the harvesting, preserving, drying, processing, canning, packing, grading, storing, handling, shipping, or utilization thereof, or the manufacturing or marketing of the by-products thereof; or in connection with the manufacturing, selling or supplying to its members of machinery, equipment or supplies, or in the financing of the above enumerated activities; or in any one or more of the activities specified herein." Acts 1925, ch. 20, § 4, p. 43.

"Sec. 5. Powers. Each association incorporated under this act shall have the following powers:

"(a) To engage in any activity in connection with the marketing, selling, preserving, harvesting, drying, processing, manufacturing, canning, packing, grading, storing, handling, or utilization of any agricultural products produced or delivered to it by its members, or the manufacturing or marketing of the by-products thereof, or any activity in connection with the purchase, hiring or use by its members of supplies, machinery or

The by-laws of the corporation provided for the date of each annual meeting of the members. There was no evidence that the annual meetings were not held each year on the day fixed in the by-laws. A few witnesses testified they did not receive notice by mail of the annual meetings. Apparently none of the complaining members took any steps whatever to ascertain or be present at any annual meeting of the members. There was no evidence that there was any intentional failure to mail out notices of the annual meetings, and the fact that a few of the members may not have received notice of the annual meetings would not entitle them to have a receiver appointed.

There was evidence introduced in behalf of the plaintiffs, which was directly controverted by the defendants' evidence, to the effect that in the election of directors in 1936 and 1937 there had been tampering with the ballots by the manager and two employees. There is no evidence that any director ever participated in this, or had any knowledge thereof prior to the time it

---

equipment; or in the financing of any such activities; or in any one or more of the activities specified in this section.

" . . .

"(f) To buy, hold and exercise all privileges of ownership, over such real or personal property as may be necessary or convenient for the conduct and operation of any of the business of the association, or incidental thereto.

"(g) To do each and everything necessary or proper for the accomplishment of any one of the purposes or the attainment of any one or more of the subjects herein enumerated; or conducive to or expedient for the interest or benefit of the association; and to contract accordingly; and in addition to exercise and possess all powers, rights and privileges necessary or incidental to the purposes for which the association is organized or to the activities in which it is engaged; and, in addition, any other rights, powers and privileges granted by the laws of this state to ordinary corporations, except such as are inconsistent with the express provisions of this act; and to do any such thing anywhere." Acts 1925, ch. 20, § 5, p. 44.

might have occurred. One of the employees reported the occurrence to four of the directors, who "tried to do something about it." There is no evidence that ballots for directors in any election subsequent to that time had been changed in any way, or that the elections were not lawful in any respect.

The evidence was uncontradicted that when any member withdrew from the corporation and requested his share of the reserve funds he was paid without delay, but if no demand or request was made the funds remained with the corporation. There was no evidence that the corporation could not promptly meet every demand of a withdrawing member for his share of the surplus, or that the corporation would be insolvent or in imminent danger of insolvency or embarrassed financially if all former members should concurrently make demand for their share of the reserve. The prudent amount of reserve funds to be maintained by the corporation was for the determination of its board of directors, and no abuse of that discretion has been shown.

The fact that there was dissension among some of the members as to the management of the corporation is not ground for the appointment of a receiver where the corporation is solvent and the business is prosperous. High, *Receivers* § 292, p. 348, § 295a, p. 353; 2 Clark, *Receivers* (2d Ed.) § 742 p. 1095. The management of the corporation was vested in the directors and officers, and there was no evidence of any dissension in the management.

> "A holder of shares in an incorporated body, so far as his individual rights and interests may be involved in the doings of the corporation acting within the legitimate sphere of its corporate power,

has no other legal control over them than that which he can exercise by his single vote in the meetings of the company. To this extent, he has parted with his personal right or privilege to regulate the disposition of that portion of his property which he has invested in the capital stock of the corporation, and surrendered it to the will of a majority of his fellow corporators. The jus dispondendi is vested in them so long as they keep within the line of the general purpose and object for which the corporation was established, although their action may be against the will of a minority, however large." 2 Clark, *Receivers* (2d Ed.) § 742, pp. 1095, 1096.

If a majority of the members are merely dissatisfied with the management, it can be changed at the next annual election.

"One who buys stock in a corporation takes it subject to the right of the majority stockholders to elect the officers and control the company and its property. That is of the very essence of a corporation. . . .

"We know of no statute which authorizes a decree of dissolution merely because of a disagreement between the stockholders as to who shall hold the offices and how the business shall be conducted." *Enterprise, etc., Pub. Co.* v. *Craig* (1924), 195 Ind. 302, 308, 144 N. E. 542, 145 N. E. 309.

Before mismanagement and misconduct alone can be cause for the appointment of a receiver, they must be so gross or fraudulent as to affect the substantial rights of stockholders or creditors. 16 Fletcher, *Cyc., Corporations* (Perm. Ed.) § 7714, p. 130; *Allied Magnet Wire Corp.* v. *Tuttle* (1927), 199 Ind. 166, 154 N. E. 480, 156 N. E. 558, 50 A. L. R. 252.

The auditing and marketing services performed by the Indianapolis Sales Association, Inc. was of value

to the appellant corporation. Sections 21 and 22 of ch. 20 of the 1925 Acts authorized such acts and expenditures.[2] The undisputed evidence was that the manager Hedges received no salary or per diem nor any reimbursement for expenses for the services he rendered Indianapolis Sales Association, Inc., and the balance remaining after the operating cost of the sales association had been deducted from service charges received from the cooperatives was returned to the cooperatives on a pro rata basis computed according to the total pounds of milk the various cooperatives handled through the association. As to whether or not the one and one-half cents (1½c) per hundredweight of milk sold by the appellants which was paid to the Indianapolis Sales Association, Inc. was a necessary reasonable expense was a matter for the determination of the management of the appellant cooperative, and

---

[2] "Sec. 21. Interest in Other Corporations or Associations. An association may organize, form, operate, own, control, have an interest in, own stock of, or be a member of any other corporation or corporations, with or without capital stock, and engaged in preserving, drying, processing, canning, packing, storing, handling, shipping, utilizing, manufacturing, *marketing, or selling of the agricultural products handled by the association, or by-products thereof.* (Italics added.)

". . .

"Sec. 22. Contracts and Agreement[s] with Other Associations. Any association may, upon resolution adopted by its board of directors, enter into all necessary and proper contracts and agreements and make all necessary and proper stipulations, agreements, and contracts and arrangements with any other co-operative corporation, association or associations, formed in this or in any other state, for the co-operative and more economical carrying on of its business or any part or parts thereof. Any two or more associations may, by agreement between them, unite in employing *and using or may separately employ and use the same personnel,* methods, means and agencies for carrying on and conducting their respective business." (Italics added.)

Acts 1925, ch. 20, §§ 21 and 22, p. 55.

there is no evidence that there was any abuse of discretion in the employment of the services of the sales association.

The plaintiffs' complaint that the cooperative was violating Clause 4 of the Producer's Contract by deducting six cents (6c) instead of five cents (5c) per one hundred (100) pounds of milk, which was used for advertising to increase the consumption of milk, does not present any equitable ground for the appointment of a receiver. It merely constitutes a breach of contract for which recovery might possibly be had in actions at law. There was no evidence that the corporation was not financially able to pay or refund any such sums which might have been deducted in excess of the contract provisions.

The defendants' motion for a further hearing upon the application for appointment of a receiver was filed before the trial court made its order appointing a receiver. It alleged facts occurring subsequent to the conclusion of the evidence heard by the court. Under the record we must presume that the defendants were in a position to introduce evidence tending to prove that another regular annual meeting had been held at which none of the plaintiffs proposed or suggested any remedies, that the collection of one cent (1c) per one hundred (100) weight of milk for advertising purposes had been discontinued, that new directors and officers had been legally elected in accordance with the by-laws and articles of incorporation, that the 1946 annual report had been filed in the office of the Secretary of State on March 31, 1947, and that the corporation was still solvent and would introduce its balance sheet and operating statement for the six (6) months period ending June 30, 1947. These were matters pertinent to the inquiry and concerned

the issues made by the plaintiffs. In a receivership matter the inquiry should not be limited to the commencement of the proceeding. The occasion for the appointment of a receiver, and the danger if a receiver is not appointed must exist at the time an appointment is made. 53 C. J. 39 § 22; *Yanakeff* v. *George* (1935), 207 Ind. 703, 194 N. E. 329. Although in general considerable discretion must be vested in the trial court in determining whether additional evidence shall be heard after the taking of evidence has been concluded and before the court makes its finding, yet since the necessity for the appointment of a receiver must exist at the time the application is filed and up to the time the order appointing a receiver is made, it was error for the court in this instance to overrule the defendants' motion for further hearing.

In view of the appellees' failure to prove a cause for the appointment of a receiver when the evidence on mismanagement or irregularities is considered either as constituting separate acts or omissions of mismanagement or as constituting mismanagement in gross, it is not necessary to consider the effect of the arbitration provisions of the by-laws of the cooperative and the arbitration clause of all producers' contracts.

The alleged error in overruling appellants' demurrer to the amended complaint will not be considered in an appeal from an interlocutory order appointing a receiver. That alleged error must be presented on appeal from the final judgment in the cause, since neither § 3-2603 Burns' 1946 Replacement nor § 2-3218 Burns' 1946 Replacement makes any provision for any review of such rulings.

Moreover, that part of the amended complaint that may be considered as an application for the appointment of a receiver as ancillary to the main cause can-

not be tested by a demurrer, since ". . . 'the sufficiency of a complaint, in an action in which a receiver is applied for, cannot be tested by demurrer, or otherwise, at the time of the application or motion for the appointment of a receiver. Pleadings and demurrers are not relevant to such an application,' (*Bufkin* v. *Boyce* (1885), 104 Ind. 53, 55, 3 N. E. 615, and cases there cited; *Gray* v. *Oughton* (1896), 146 Ind. 285, 45 N. E. 191), . . ." *West* v. *Reeves* (1934), 207 Ind. 404, 407, 190 N. E. 431, 193 N. E. 375.

The order appointing a receiver is reversed.

Young, J., not participating.

Note.—Reported in 79 N. E. 2d 399.