# Richmond.

MARY BRENNAN, ET ALS. V. ALBERT ROLLMAN, ET ALS.

October 30, 1928.

716

The opinion states the case.

*S. S. P. Patteson, O. R. Cunningham, George Bryan* and *Robert Thomas,* for the appellants.

*R. W. Carrington* and *Hunton, Williams, Anderson & Gay,* for the appellees.

McLEMORE, J., delivered the opinion of the court.

Petitioners, Mary Brennan, National Equitable Finance Company, Chippie Williams and others are here asking a review and correction of errors resulting from the entry of two decrees of April 1, 1927, and June 8,

1927, by the Chancery Court of the city of Richmond in the consolidated causes hereafter designated as *Mary Brennan, et als.* v. *Albert Rollman, et als.* In the first of which the court annulled two previous decrees, one entered March 2, 1927, and the other, a supplemental order of March 16, 1927, thereby practically adjudicating the principles of the cause, and by the order of June 8, 1927, gave effect to the decree of April 1, 1927, and ordered the property then in the hands of the court's receivers, returned to its owner the National Equitable Investment Company, Incorporated.

National Equitable Investment Company, hereafter referred to as investment company, was incorporated in Virginia January 24, 1920, with its principal office in Richmond, with F. M. Jackson, Edgar P. East and Henry E. Clark, incorporators, and these with Edward B. Arnett, secretary, and B. Webster, composed the board of directors. Of this board Jackson and East were the principal actors, and entirely dominated the corporation.

Seventeen thousand three hundred and thirty-five shares of preferred stock was sold, for which the investment company received $1,733,500.00 and 19,564 shares of common stock was sold for ten cents per share, aggregating $1,956.40, a total of $1,735,456.40. The preferred stock had no voting privileges unless the company had failed for four consecutive quarterly periods to meet the dividend requirements. This stock was placed upon the market, and in large measure sold, by Spence & Company, New York brokers. The common stock was distributed about as follows: To Jackson 3,550 shares, to East 4,550 shares or 8,100 shares out of a total issue of 19,564 shares. The remaining 11,464 shares of the common was distributed over a large area and to numerous purchasers, the result of which distribution

was, for all practical purposes, to place the control of the corporation in the hands of Jackson and East, the holders of 8,100 shares of the stock.

The charter of the investment corporation was liberal in the powers conferred, but the central purpose of the company seems to have been to conduct a semi-banking business, wherein small loans are made upon high rates of interest, usually upon personal security. To this end the company acquired the stock, or a major portion thereof, of six small loan companies with numerous branches and one shopping system company, all of which were operating north of Virginia—and in so far as appears from the record—successfully. The company domesticated in New York and had its principal office there.

On June 16, 1921, American Institute of Medicine, Incorporated, was chartered and organized under the laws of Virginia for the ostensible purpose of publishing a medical journal. The capital structure consisted of 1,648 shares of preferred and 4,645 shares of common stock, of which the investment company owned 1,076 shares of the preferred and 2,886 shares of the common. There seems to have been no reason, justification or excuse for the creation of this American Institute of Medicine, Incorporated, from the standpoint of the investment company.

Jackson and East were also officers of the institute, and caused the investment company to purchase its stock to the extent of $105,414.00 and to lend it the sum of $568,798,04 by the devious methods of having the institute issue to them (Jackson and East) the companies notes, which Jackson and East caused the investment company to purchase, upon their individual endorsement of the institute notes, but *without recourse upon them*. They also had the investment com-

pany make other cash advances to the institute amounting to $75,000.00. The result of all this being that the investment company had in stock and unsecured notes of the institute. the sum of $749,212.04.

As to what became of this large amount of money going into the hands of the officers of the institute the record is silent, but the fact does appear in the record that upon a winding up by a receiver appointed by the Chancery Court of the city of Richmond, of the affairs of the American Institute of Medicine, the total assets were about $300.00.

With this tremendous loss, and impairment of the capital of the investment company, it found its credit seriously impaired, dividends on the preferred and common stock had to be discontinued, and discontent on the part of the stockholders became general, and properly so.

A stock salesman employed by E. H. Spence & Company, of New York, in connection with the original sale of the stock of the investment company, Charles B. Frasca by name, now comes into the picture, and representing a small minority of the stockholders, brought vexatious litigation in New York with the ostensible purpose of rescinding the subscription contracts and having the money they had paid on the stock returned. These suits apparently resulted unfavorably to the plaintiffs, but seriously affected the credit of the investment company.

On or about the first of January, 1926, John W. Hatch, another salesman of Spence & Company, himself also a stockholder, organized a stockholders committee of which he was chairman, for the purpose of protecting as best they might the minority interest in the corporation.

Prior to the happening of these last mentioned events,

investment company, withdrew its principal business office from New York, and its corporate domicile for all purposes thereafter, was, and is, Richmond, Virginia.

In November, 1925, there was organized under the laws of Virginia the Continental Finance Corporation with its principal office in Richmond, and the following officers and directors: Sylvester Z. Moore, of Pennsylvania, president, R. Hill Fleet, of Richmond, vice-president, treasurer and director, W. Fleet Kirk, of Richmond, second vice-president and director, Oscar L. Shewmake, of Richmond, secretary and director, and Edward B. Arnett, Sea Island, New Jersey, director.

This corporation, it is claimed, was organized for two major purposes, first, to take over all the assets of the investment company, thereby placing them beyond the reach of the courts of New York and New Jersey, wherein numerous suits were then pending against the company; and, second, to eliminate Jackson and East from control or any part in the management of the affairs of the company. Accordingly the finance corporation caused to be issued 850 shares of its capital stock, which was turned over to the investment company, for which the latter company caused to be transferred to finance corporation all of the stock held by it in the numerous subsidiary operating companies.

The result of all this was to place the operation of the subsidiary companies under the control of Continental Finance Corporation, with National Equitable Investment Company holding all the capital stock of finance corporation, and therefore leaving the control of the entire properties in the same hands as before the transfers were made.

This situation was far from satisfactory to those stockholders who knew of the gross, if not criminal,

mismanagement of the investment company under the dominance of Jackson and East, and as a result of persistent pressure from various sources, the said Jackson and East entered into an agreement by which they pledged their stock, together with voting privileges, to three trustees, and also to be held by the trustees to secure their indebtedness to the finance corporation.

At the annual meeting of said company held January 18, 1926, five new directors were elected: One of these, Edward B. Arnett, was brother-in-law of East and close friend of Jackson, the result being that those stockholders represented by the Hatch committee were still dissatisfied with the management of the investment company, and proceeded on May 4, 1926, to file their bill of complaint in the Law and Equity Court of Richmond, setting out among other things the facts above related.

This bill prayed for an accounting, for the appointment of receivers, the conservation of the assets, the rehabilitation of the companies' affairs upon a sound financial basis, etc., and for general relief. On May 4, 1926, an order was entered in the cause referring the papers to a commissioner in chancery to make certain enquiries suggested in the bill, and on the following day (the cause having been transferred to the Chancery Court of the city of Richmond) R. Hill Fleet, Oscar L. Shewmake and Harry E. Keller were appointed re-receivers of the investment company.

This company, at the time of the appointment of receivers, had as its only asset the entire issue of the capital stock of Continental Finance Corporation—850 shares—and the assets of Continental Finance Corporation consisted of the stock of seven subsidiary operating companies, with sixteen loan offices.

The first report of the receivers, filed June 17, 1926,

showed that for the four months from January 1st to May 1, 1926, the period during which the continental company had been in control of the operating companies, their net earnings had been $52,579.00, with April showing a net of $15,060.00. The consolidated net assets of the two companies (which may be treated as one) as of May 1, 1926, amounted to $823,750.00, with earnings (if maintained) at the rate of something over $150,000.00 per year. This was briefly the situation upon the receivers taking possession, and assuming the management of the companies.

On June 17, 1926, Mary Brennan and numerous other stockholders of investment company, representing 2,425 shares of preferred stock and 121 shares of the common filed their petition in the pending cause, in which they charge that the company was still under the domination of the original management that had wrecked the company; it further set out that the company was, and is, hopelessly insolvent and should be wound up and its assets distributed. It also asked for the removal of two of the receivers, Oscar L. Shewmake and Harry E. Keller. Answers were filed to said petition and on June 17, 1926, J. H. Rives, Jr., a member of the law firm representing Mary Brennan, *et als.* was added to the list of receivers already appointed.

On July 9, 1926, Lucius M. Bush and James Hart, of New York, and Henry B. Worthem, of New Jersey, filed their petition in the said chancery cause, in which they amplified the difficulties of conducting the small loan business under the then existing conditions, sought the privilege of examining the records of the investment company, and for other relief.

The second receivers report was filed July 15, 1926, giving the condition of the several subsidiary companies operated by them, and then suggested that a stock-

holders meeting be called to consider the best plan to be pursued with respect to the future of the investment company. A meeting was accordingly held under the court's order, by its commissioner, Mr. Hill Montague, of Richmond, Virginia. At this meeting, held on August 9, 1926, there was represented in person or by proxy 9,022 shares of preferred and 5,958 shares of common stock—exclusive of the 8,100 shares of Jackson and East under the control of Messrs. Moore, Arnett & Shewmake—assigned to them for the protection of the investment company because of Jackson and East's indebtedness to it.

There were three plans under consideration at this meeting for the future of the investment company.

Plan No. 2 is: "The continued operation of the small loan business owned and controlled by the National Equitable Investment Company, Incorporated, through its subsidiary, the Continental Finance Corporation, and restoration of its impaired capital by withholding and applying the profits of the business in the development and expansion thereof, and declaring no dividends until said impaired capital should be restored."

And the vote cast for and against same was as follows:

"For: Preferred stock..............5878 shares
"Common stock....................3606      "

    "Total for.....................9484 shares

"Against: Preferred stock..........3144 shares
"Common stock....................2352      "

    "Total against.................5496 shares."

Although there was a substantial majority against

dissolving the investment company, and the commissioner found that there were no creditors; yet he advised the dissolution of the company, unless the stockholders "can present a plan and provide the necessary additional capital for rehabilitating the affairs of the company, etc."

The attention of the court was called to the fact that the annual meeting of the company was to be held on January 17, 1927, and Commissioner Montague was thereupon directed to conduct the meeting. The total voting shares at this time (preferred and common) were 33,399, and there was represented and voting 11,-646 shares preferred and 12,349 of common. The issue between the opposing factions is embodied in proposition No. 2, above referred to, and the election of directors was with this in mind. G. A. Kruttschnitt, S. Willard Coleman, Charles W. Littlefield, John Garland Pollard, Clifton M. Miller, Oscar L. Shewmake, and W. T. Smithdeal were chosen directors, the vote for them being 15,339, against 4,056 opposing. The Charles B. Frasca group of stockholders (167 shares), and the Finance Company of Delaware, a competitor in the small loan business with 3,889 shares, made up in large measure the minority vote against the plan No. 2.

Commissioner Montague conducted the election of directors, at which time the report of earnings up to January 1, 1927, showed net for twelve months of $187,844.00, however, the commissioner in his report to the court filed February 17, 1927, dealing at some length with the entire status and operation of the several related companies, concludes that as "no plan was submitted by the stockholders for the continuation of the business of the company under their direction and control" he was of the opinion that the company should be liquidated, etc.

Upon this report, to which exceptions had been taken, the consolidated causes and petitions filed therein with proper answers came on to be heard on March 2, 1927, and a decree was entered substantially confirming the commissioner's report and directing a sale of the assets of the investment company for the purpose of dissolution of the corporation and distribution of the assets among the stockholders.

On April 1, 1927, John W. Hatch, representing the majority of the stockholders voting at the annual meeting, filed a petition asking for a rehearing and annullment of the decree of March 2, 1927. Argument on the petition was elaborate and exhaustive, the conclusion of the court being best understood by reference to the following extract from the decree:

"On consideration whereof, the court being of opinion that it has not been shown that the objects of the defendant corporation, National Equitable Investment Company, Incorporated, are impossible of attainment, and that the court has no power to make a sale of the assets of the defendant, National Equitable Investment Company, Incorporated, upon the facts appearing in the record, and that said order of sale entered on the 2nd day of March, 1927, and said supplemental order entered on the 16th day of March, 1927, are erroneous, doth adjudge, order and decree that said order of sale entered in these causes on the 2nd day of March, 1927, and said supplemental order entered on the 16th day of March, 1927, be, and they are, set aside, annulled and vacated."

This decree was followed by an order entered June 8, 1927, in which the receivers were directed, after the payment of costs and sundry items growing out of the litigation, to return the assets of the investment company to its proper owners, the stockholders and directors, the reasons for the court's action being:

"(1) That the objects of said suits have been accomplished; that the stockholders of said National Equitable Investment Company, Incorporated, have elected a competent board of directors, which in turn has elected competent officers; that said board and officers are ready and able to competently function as such; that there is nothing further to be done in said suits; that said receivership should not be longer continued with the expense incident thereto, and that there is nothing further to be done in said suits.

"(2) That no issues are now before this court on the pleadings in said causes or otherwise, and that the bill in each of said cases is without equity, and that said receivers be discharged, and the cases dismissed and stricken from the docket for lack of jurisdiction."

The conclusions reached by the chancellor as expressed in the decree of April 1, 1927, and made effectual in the final order of June 8, 1927, are before us for review.

The foregoing is a mere skeleton of what seems to us the essential facts to be stated, in order that those interested may be in a position to get a fairly intelligent idea of the situation as it was presented to the learned chancellor for adjudication. To those desiring more detailed information as to the many and complicated cross currents, with which this case abounds, we suggest a perusal of the record, and of the very able and elucidating briefs of counsel, consisting of something like 1,000 pages of printed matter.

The first assignment of error, which is the real issue to be determined by this court, reads:

"The Chancery Court erred in finally refusing to confirm the reports of Commissioner Montague and in holding that the evidence did not show such a case of gross mismanagement of National Equitable Invest-

ment Company, Incorporated, resulting in the loss of over half of its capital, acute and growing dissensions among its stockholders and other serious corporate troubles, as to justify and necessitate in a suit by minority stockholders a decree of sale of the remaining assets and a distribution of the proceeds among those entitled thereto, upon the ground that the objects and purposes for which the corporation was formed had become impossible of attainment and impracticable."

Here we have a corporation that has been grossly mismanaged, its assets have been dissipated in a manner that should arrest the attention of the criminal courts. That commandment thundered from Sinai's sacred heights: "Thou shalt not steal," is likewise. condemned by the law of the State, but is not directly involved in this litigation, as courts of equity do not ordinarily undertake to enforce the penal statutes.

The question for this court to determine is whether or not the affairs of the corporation, as they appear at this time, have reached such a stage as that the purposes and objects for which the company was formed are impossible of attainment, so that to continue its operation must eventually be ruinous. 1 Morawitz on Private Corporations (2nd ed.), section 284 and 285; 8 Fletcher Cyc Corp. pages 9156 and 9157; *Benedict* v. *Columbus Construction Co.*, 49 N. J. Eq. page 36, 23 Atl. 485; *Dixie Lumber Co.* v. *Hellams*, 202 Ala. 488, 80 So. 872; *Manufacturers' Land & Improvement Co.* v. *Cleary*, 121 Ky. 403, 89 S. W. 248; *Radford West End Land Co.* v. *Cowan*, 101 Va. 632, 44 S. E. 753; *South Norfolk Land Company* v. *Tebault*, 124 Va. 667, 98 S. E. 679.

The doctrine has been nowhere more clearly stated than in 8 Fletcher Cyc. Corp., *supra*, which is abundantly supported by text-writers and adjudicated cases without number:

"Such a suit may be brought without reference to the solvency of the corporation, but neither a distribution of assets nor a dissolution will be ordered where the lack of ability to continue as a going and successful concern, or to become successful at a future time, is doubtful. So long as a corporation is a going concern, it is held that minority stockholders cannot obtain a dissolution in equity 'so long as the conditions exhibited do not demonstrate to a moral certainty that its continuation must by inevitable necessity result in serious loss in the near future and in complete ruin sooner or later.' "

What are the essential facts in the instant case?

1st. A corporation under a management unfaithful, unworthy and dishonest; that squandered with criminal recklessness about $900,000.00 during the period of the Jackson and East control, which ended about May 1, 1926, leaving the investment company at that time with only about $800,000.00 net assets, but owing practically no creditor obligations.

2nd. On May 6, 1926, receivers were appointed upon a petition of stockholders by the Chancery Court of the city of Richmond, who took over the assets of the investment company and undertook to operate the subsidiary companies.

3rd. From that day forward the results from these companies were favorable, showing average net profits of approximately $15,000.00 per month.

4th. At a stockholders meeting held February 7, 1927, and conducted by the court's master commissioner, a board of directors of integrity and character was elected by an overwhelming majority of the stockholders, all of said majority being opposed to a dissolution of the company, and favorable to its continued operation under the new board of directors.

5th. In the report to the court of May 9, 1927, signed by all of the receivers, it is stated:

"Your receivers are pleased to report that at this date all of these corporations are in good standing in the various States in which they operate. Attached to this report and made a part hereof will be found certain tables and statements showing the financial condition of the corporation and its subsidiaries at various dates during the past year. It will be observed that there has been a steady increase in the aggregate net earnings of all of the corporation and it is also true that every individual corporation comprising this system has shown a substantial net profit. The net earnings of the small loan offices, after the payment of all expenses, including operating expenses of the home office, have been approximately $15,000.00 per month since they were taken over by the Continental Finance Corporation, while during the past six months, the average net monthly income has been $16,022.60. It is interesting to observe that this increase in the earnings has not been accompanied by any substantial increase in operating expense. It is submitted that these figures will compare favorably with those large loan companies which are admittedly well managed and recognized as among the most successful now in operation."

6th. The minority stockholders are now aggrieved because the chancellor declined to dissolve the corporation, but on the contrary vacated the receivership, and turned the property back to its owners, the stockholders.

The principal argument advanced for a dissolution of the corporation is the gross mismanagement and fraud practiced upon the stockholders under the disastrous regeme of Jackson and East. This objection

is met, and we think successfully, by the fact that their influence in the control and policy of the company has been entirely eliminated, and the stock once held by them has passed to others, who are independent of them or of their influence. We are now dealing with the corporation, not as it was controlled under the Jackson and East management, but as it stands today, in the hands of honest directors, selected by the stockholders in the usual way, with the avowed purpose of continuing the operation of the subsidiary companies, because they believe, with every good reason for so doing, that the company can continue to operate successfully and in a reasonable time restore the capital structure to a par basis—or better.

As said in *Duncan* v. *Treadwell Company*, 82 Hun (N. Y.), 377, 31 N. Y. S. 341:

"Since the commencement of the action a new election of directors of the corporation has been had, and the two malfeasant directors removed, and the plaintiff and those in accord with him are in control of the corporation.

"It is, hence, difficult to see on what ground the receivership continues. Directors against whom no charge is made are in control of the corporation, and, although the action may be continued for the purpose of a judgment against the malfeasant directors, there can be no object in continuing such receivership. The object for which plaintiff obtained the appointment of the receiver has been attained by the voluntary action of the corporation and its stockholders.

"We are not aware of any statute or law which justifies the continuance of the receivership for the purpose of giving the corporation time to raise money to pay its debts. There seems to be no other reason why there should continue to be a receiver of the George C. Treadwell Company. * * * *.

"We think the papers before us clearly show, assuming that the appointment of the receiver in this action was originally authorized, that the continuance of the receivership is unnecessary and improper."

The same doctrine is announced in *Edison* v. *Edison United Phonograph Co.*, 52 N. J. Eq. 620, 29 Atl. 195; *Trade Auxiliary Company* v. *Vickers*, 16 Eq. Cas. (L. R.) 303; *Howze, et al.* v. *Harrison*, 165 Ala. 150, 51 So. 616; *Farrer* v. *Nebraska Building and Investment Company*, 108 Neb. 698, 189 N. W. 359, 43 A. L. R. 225; *Radford West End Land Company* v. *Cowan*, 101 Va. 632, 44 S. E. 753; *South Norfolk Land Company* v. *Tebault*, 124 Va. 667, 98 S. E. 679.

In Beach on Receivers (Alderson's ed.), section 421, it is stated:

"It follows necessarily that the control of the court of the corporate property must be temporary. 'The court,' it has been correctly said, 'will take charge of the property until there is an adjustment of the trouble, or the election of a new board of directors; and when the officers are ready to proceed in the proper discharge of the duties the court must lift its hand and retire.' "

In the light of these authorities, to which a great many additional cases could be added supporting the doctrine, we have no hesitancy in concluding that the chancery court was clearly right in lifting its hand from the control of a solvent corporation, and handing it back to its owners.

The power of courts of equity to take possession of and liquidate a functioning solvent corporation at the instance of minority stockholders, is recognized in many jurisdictions, including Virginia. *Ulmer* v. *Maine R. E. Co.*, 93 Maine 324, 45 Atl. 40; *Benedict* v. *Columbus Construction Co.*, 49 N. J. Eq. 23, 23 Atl. 485; *Sant* v. *Perronville Shingle Company*, 179 Mich. 42, 146 N.

W. 212; 8 Fletcher Cyc. Corp., pages 9156-9157; *Stevens* v. *Davison*, 18 Gratt. (59 Va.) 819, 98 Am. Dec. 692; *Camden Safe Deposit and Trust Company*, 115 Va. 20, 78 S. E. 596.

But while the above authorities establish the power of the courts to dissolve solvent corporations, *it is concededly a power that can be easily· abused, and one that should be cautiously exercised.* If the purposes for which the company· was formed have become impossible of attainment, and to continue the business would be manifestly ruinous to its shareholders, equity may interpose, but not otherwise.

Stated in different language, but recognizing the same general principles, is a quotation from *Benedict* v. *Columbus Construction Company*, 49. N. J. Eq. 23, 23 Atl. 485:

"It has been decided that if 'it plainly appears that the object for which the company was formed is impossible, * * * * it becomes the duty of the company's agents to put an end to its operations and wind up its affairs; and, should they, even though.supported by a majority of the shareholders, pursue operations which must eventually be ruinous (or should the enterprise be abandoned as impossible of realization), any shareholder * * * * would, upon plain equitable principles, be entitled to the assistance of this court (of equity), and decree should be made compelling the directors to wind up the company's business and distribute the assets among those * * * * entitled to them.' "

It seems to us difficult to understand how the learned chancellor could have reached any other conclusions than those to which expression has been given in the final decrees appealed from, where the right of the majority to place the conduct and management of its

properties and business in the hands of an honest board of directors of its own choosing is recognized and preserved.

They seem to us to be buttressed in justice and supported by an array of authorities, impressive, logical and convincing.

*Decrees affirmed.*

CHRISTIAN, J., dissenting:

I wrote the opinion in this case originally, but my brethren would not concur in my views. They believe there was no authority found in the books for my position, while I claimed there was no authority needed but the conscience of the chancellor to stamp the purposes of the promoters of this corporation and its organization with the disapproval and condemnation of this court. The reason of the law is the life of the law, and because a proposition of law is written in a book, does not make it just or right, as justice and righteousness can only be written in the conscience of men.

Therefore, in my humble judgment, no authority can be found when rightly construed which warrants our *holding the appellants* stockholders of a corporation organized for fraudulent purposes, and after organization conducted by the promoters so dishonestly that the majority opinion states that it was properly the subject for the criminal courts, until Frasca disclosed the fraud and misrepresentation of Jackson, East, and Spence and Company, by which the stockholders were induced to purchase stock, and as a result of his disclosures the court took possession of what remained and in the receivership suit the sinister purpose of the promoters from the beginning was disclosed. The opinion says on this subject that a court of equity cannot enforce the criminal law.

This is true, but it is also true that a court of equity

cannot rehabilitate a fraudulent contract or give validity to an illegal organization.

Here I want to say that the considerations and reasons upon which I based my opinion that this corporation be dissolved, were not called to the attention of the learned chancellor of the trial court by his commissioner nor counsel on either side of the case, nor was it argued before this court, but the facts of the illegal and fraudulent organization of the corporation appeared upon the face of the record and are uncontradicted, and it is my judgment that it is *the duty of this court "ex mero motu" to declare that a corporation promoted for dishonest purposes and organized in fraud has no existence in equity.*

Here is the line of difference between my brethren and me. They cite in their opinion numerous authorities to sustain their view, and as applied to a proper state of facts they are undoubtedly sound law. But every case in which the principle of law was enunciated, will be found to be based upon a valid and legal incorporation. The reason upon which the law is based, as stated in most of the decisions, is that each stockholder agrees when he subscribes to the stock of a corporation (or when he purchases properly issued stock) that its affairs shall be controlled by the majority. Therein is involved the axiom of the law, that it is the function of courts to enforce contracts not make contracts for people, nor rehabilitate invalid ones.

It is a basic principle of corporation law that its stockholders become members of the corporation by contract, and *that there is no privity of contract among the stockholders inter se.*

In the trial court the question of the jurisdiction of courts of equity to dissolve corporations was debated,

but that such jurisdiction exists in Virginia is admitted before us. The majority opinion would lead to the belief that there is only one cause for dissolution by the court, that is, impossibility of accomplishment of the purposes of its organization. Hence it is proper to state the reasons for the exercise of the visitorial powers of courts of equity over corporations.

In this era of industrial development corporations have so grown that they own and control most of the wealth of the country and conduct most of its business. The American talent for organization and executive management is very largely engaged in the development and management of corporate enterprises—its accomplishments have been wonderful. For the most part this work has been done honestly, efficiently and creditably. But not always has this been the case. These companies have been found to be efficient instruments of fraud, speculation, plunder and illegal gain. The ingenuity and fruitful cunning of adroit, experienced and unscrupulous talent have plundered and robbed the corporations, the stockholders and investing public, so that a system of jurisprudence has grown up to remedy the frauds of corporate directors, corporate agents, corporate organizers, and unscrupulous majorities. Besides, all the States have prescribed more or less laws for the organization, supervision and reporting of corporations for the purpose of protecting the stockholders and the public from these abuses.

As set forth in the majority opinion, F. M. Jackson and Edgar P. East secured the charter of the investment company and controlled its operations until the court took charge thereof. But in order to disclose their sinister motives to plunder the public and the stockholders, it will be necessary to set forth in detail,

as briefly as possible the facts as disclosed by the record.

They secured from the Corporation Commission the charter. Its principal office was in the city of Richmond, but it immediately, to escape supervision of the Commission, became domesticated in the State of New York.

The charter conferred power upon the incorporators *"to establish a corporation under and by virtue of the provisions of the Code of Virginia."* Jackson and East presumed that they were the corporation by virtue of the charter. No subscriptions for stock were taken as required by section 3778, if any very few, but almost all of the stock was sold in the open market, as duly subscribed for and issued stock of an existing corporation, nor was any organization meeting ever held as required by law.

Said stock, amounting to 17,335 shares of preferred stock of the par value of $100.00 for which the company received $1,735,500.00; and 19,364 shares of *no par value common stock at* ten cents per share, or a total of $1,956.40, was sold and issued, for the most part under a so-called three-cornered agreement between the company, said Jackson and East, and E. H. Spence and Company, a New York brokerage firm. It was in fact nothing but fraudulent conspiracy to swindle the public, as the working out of the scheme discloses. The stock was issued upon order of Jackson and East in blocks of two (2) shares of preferred, two (2) shares of common, the company to receive the sum of two hundred dollars and ten cents per block, after which it appears that Spence sold the stock in blocks of two shares of preferred and one (1) of common, for from two hundred and fifty dollars ($250.00) to three hundred dollars ($300.00) per block, Jackson and East

retaining the extra share of common stock originally issued, and they and Spence dividing the premiums thus received. Frasca and Hatch, leaders of the contending groups of stockholders, salesmen of Spence and Company, sold large blocks of this stock and received ten per cent commission therefor and were *in pari delicto*. Frasca sold $50,000.00 worth of the stock for which he received $5,000.00. Hatch sold $200,000.00 and at the same commission received $20,000.00. Thus by a little calculation will be seen the large sum that Jackson and East and Spence divided among themselves.

The fraud and misrepresentation by which this stock was sold to the public was that the company was well established and had prospects and surplus sufficient to pay the eight per cent preferred dividend for five years, when the corporation had never been organized. If this had taken place in Virginia under our statute all the parties would have been sent to jail.

The primary purpose and object of the investment company was the small loan business or *quasi* banking business. Acts 1919, page 75, section 1 (Virginia Code G. L. 1923, section 3848, book 1), forbids organizations of this character from issuing no par value stock. But this was so essential to their scheme to get control of all the money of the stockholders, that they perpetrated a fraud upon the State statute, and were thus enabled to misappropriate and embezzle more than $900,000.00 of the money of the company, through their no par value stock.

Frasca disclosed the fraud and misrepresentations by which the stock was sold. Several hundreds of stockholders sued in the court of New York and New Jersey to have their subscriptions cancelled. Practically the only defense made to these suits was that the stock was

purchased in the open market from Spence & Company. The stockholders did not know until the evidence was taken in this cause that the investment company was never legally organized, and that said stock was fraudulently issued.

Jackson and East had the finance company organized and had transferred, without consent of the stockholders, all the stock of the small loan companies to the finance company for its stock that was valueless. This was illegal and not binding upon any of the stockholders.

It is true that men of high standing and character are now the directors of the company, but what assurance has any stockholder that they will be continued in office any longer than the court has control? They were elected by proxies held by Hatch, and he will no doubt oust them and take control as soon as he can. But can the character and standing of the present directors purge the investment company of fraud and make legal a corporation conceived in fraud, and organized for plunder?

It is a principle of law and common justice that needs no citation of authority that where a corporation is organized for fraudulent purposes, and stockholders are induced to purchase stock or subscribe for same by fraud and misrepresentation, there is no legal corporation and any stockholder may sue and have the company dissolved and the assets distributed.

But even conceding that the corporation is legally existent, still the character of the business is such that it can never be a success. Several years of preferred dividends are due and are prior liens upon the earnings. There is over $900,000.00 of impaired capital to be made up in addition, by usurious interest of three and one-half per cent per month out of the necessities of the poorest class of our citizens.

In the preamble to "Uniform Small Loan Law" (Acts 1922, page 502, section 1), and which is found in General Laws of Virginia, section 4168-1, the General Assembly sets forth its object to be to get rid of the "loan shark" and says: "*It is not intended to provide additional interest compensation for loans of money or necessarily an interest rate higher than the conventional rate in this State*," but to recognize the expenses of such business, and the great losses, therein, so that those who pay are made to pay losses of those who do not pay. According to the workings of the law as disclosed in this case, a corporate loan shark has been substituted for the individual ones. It was plainly never the intention of the General Assembly that these small loan companies should make thirty per cent net dividend per annum out of the poor, and when such unconscionable profits are shown, it is safe to say that such companies will cease to exist. Such profits out of the needy are a fraud upon the law, and shocking to our sense of justice.

Some great jurist has said that a dissenting opinion "is like the voice of one crying in the wilderness," but while my dissent may be vain, yet I owe to myself, and the profession and public, to express my views upon the subject of this kind of high finance, and the attitude the courts should take towards it.