# T. W. PATTON v. J. W. NICHOLAS ET AL

No. A-4812. Decided June 1, 1955.
(279 S.W. 2d Series 848)

*Thompson & Coe, Vernon Coe* and *C. C. Renfro*, all of Dallas, for petitioner.

The Court of Civil Appeals erred in holding that the corporate entity should be disregarded and its assets liquidated as a vehicle of fraud, as appellees in that court did not show, nor was the evidence sufficient to entitle them to set aside the allegedly fraudulent contract whereby the parties agreed to create the corporation, since they had admitted that the corporation was legally created. It also erred in holding that the court had the power to dissolve a solvent, active corporation, Chicago, T. & M. C. Ry Co. v. Titterington, 19 S.W. 472; People Inv. Co. v. Crawford, 45 S.W. 738; State v Dyer, 145 Texas 586, 200 S.W. 2d 813.

*William S. Campbell,* of Dallas, for respondent.

In reply cited Stinnett v. Paramount-Famous Lasky Corp. of N.Y., Com. App. 37 S.W. 2d 145, 149, 150.

MR. JUSTICE GARWOOD delivered the opinion of the Court.

The judgment under review here, affirmed by the El Paso Court of Civil Appeals on transfer (269 S.W. 2d 482) has appointed a receiver for the liquidation of a profitable mercantile corporation of $280,000 paid-up capital stock and about $130,000 earned surplus, at the suit of the respondents, J. W. Nicholas and Robert R. Parks, each owning approximately 20% of the stock, against the corporation and particularly its president and director, petitioner T. W. Patton, who owned approximately

60% and is charged with fraud and abuse of his controlling position to the prejudice of the respondents and of the corporation. The respondents also sought damages, actual and exemplary, from the petitioner, but notwithstanding jury findings in this behalf of some $110,610 and $10,000 respectively, were denied such relief by both courts below, and accordingly here seek to obtain it as an addition to the decreed relief of liquidation. We granted their application because of granting that of petitioner Patton, and therefore refer to them herein as respondents and to Patton as petitioner.

The corporation in question, Machinery Sales & Supply Company, with headquarters in Dallas, was incorporated in this state in the latter half of 1945 for "the purchase and sale of goods, wares and merchandise." It, in effect, succeeded an unincorporated business of substantially the same name and purposes, which had been operating profitably in the same area for over six years previously. Prior to 1940 the business was owned entirely by petitioner, the respondents being merely young salaried employees; but in that year petitioner assigned to each of them a 10% interest in the profits, which, in 1943, was increased to 20% each. In 1944 petitioner sought to revoke this arrangement but was met with the contention of the respondents that he had made them partners. After prolonged negotiations, a written settlement of all disputes was made in August, 1945, with full participation of competent counsel on both sides. As part of this agreement, some $62,500 of bonds owned by the business were to be distributed to the parties in proportion to their respective interests of 60%, 20% and 20%, some $30,000 cash paid to petitioner, and the corporation was to be organized with the remaining property of the business as the basis of its capital stock, which in turn was to be issued to the parties in the same respective percentages last mentioned. It was further provided that the parties "will cause, by their votes, salaries of each * * as officers and/or employees of said corporation to be fixed for a period of one year from date of incorporation at $12,000.00 per year * * and that each of said parties shall be elected an officer of said corporation and employed by said corporation for a period of one year"; that "The parties hereto shall cause the first officers of the corporation to be elected for a period of one year, as follows: T. W. Patton, President, J. W. Nicholas, First Vice-President, * * *," the bylaws to provide for directors to be stockholders of record, the president and vice-presidents to be directors, and the directors for the first year "to be five," including petitioner and respondents. Provision was also made that any party might

enter into competitive business with the corporation in the event that he "shall cease to be such officer and employee" of the corporation. Purchase options with regard to the respective stock holdings were provided in the event any party should wish to dispose of his stock or part thereof. Even the detail of usage of company automobiles by the parties was agreed upon.

The agreed reorganization steps were duly taken, the business getting under way in its corporate form in the latter part of October, 1945. The respondents obviously were well advised as to the limited extent of their powers as minority stockholders under the new arrangements as distinguished from the powers enjoyed by members of a partnership. It is also quite plain that no provision was made or contemplated toward *insuring* the respondents permanent employment in or official representation of the corporation beyond the first year of operations. The by-laws, adopted pursuant to the settlement agreement, with full consent of the respondents, expressly, if unnecessarily, recognized that decisions of the Board of Directors would be made by simple majority, and that "Beginning with the date of the annual meeting * * for the year 1946 and thereafter, a director may be removed without cause upon the vote of a majority of the shares of the capital stock of the corporation at any special meeting of stockholders held for such purpose."

The corporate charter had scarcely issued when hostilities were resumed, the initial overt acts being those of the petitioner. By lenghty letters, of which he circulated copies among employees below the status of, and presumably under the authority of, the respondents, the petitioner, speaking for the most part in the first person and as if his words were that of the corporation, indicted the respondents both for "reports" of their bad habits of a personal nature and for any number of stated sins of omission and commission, many of them of a quite petty character, in connection with their work. These were supplemented with verbal admonitions of similar character in the presence of relatively subordinate employees. The letters are far too long and wordy for quotation. Suffice it to say that they and his other actions, occurring in almost a matter of days after the new arrangement began, were not only quite inappropriate and offensive, considering the position of the respondents as directors holding the next highest offices after the petitioner, but also a threat that their tenure of office and employment would probably be short. Not unnaturally, they both resigned very soon thereafter (early December, 1945) and entered into a competing business, as the settlement agreement

expressly authorized them (as well as the petitioner) to do under these circumstances.

The respondents, despite the great preponderance of their stock interests over that of any other person except the petitioner (no one else has ever owned more than one share except an employee named H. T. Smith, who once owned up to fifteen shares out of the total of twenty-eight hundred, but has now left the company and sold his shares to the petitioner) were not re-elected as directors at the end of their term (1946) or since. The new directors, as well as the two serving on the original board with the petitioner and respondents, were plainly little more than nominees and representatives of the petitioner. They included petitioner's brother and later his wife, and except for the latter, appear to have been employees, the highest salary of any being but a fraction of that paid the petitioner.

Notwithstanding the highly prosperous record of the business up through the very end of its unincorporated status and the relatively frequent and substantial distributions of profits made to the petitioner and respondents during that period, and despite the continuance of a rather high level of business after the incorporation, the books from the incorporation onward showed greatly decreased net earnings, that is, until the fiscal year ending August 31st, 1951, a date several months after this suit of respondents was filed. For that year. the net income (before income taxes) as shown by the figures of the court appointed auditor, was approximately $145,000. as against corresponding figures for the five preceding years (1946-50; taken largely from the reports of the corporation's own auditors) of approximately $48,000, $14,00. $35,000. $5.000 and $8,000. On the other hand, the figures for the five years preceding the incorporation were: 1945 (9 months) $104.000; 1944, $182,000; 1943, $195,000; 1942, $195,000; 1941, $118,000. These 1941 earnings and the $104,000 of 9 months of 1945 were respectively realized on net sales of only about $700,000 and $1,100,000, or with a respective net income-to-net sales ratio of about 17% and 10%, whereas in the corporate years 1946 through 1950, the far smaller net income above stated was on similar net sales of approximately $1,000,000 per year, thus reflecting the conspicuously lower ratios of 5.03%, 1.22%, 3.16%, 0.55% and 0.75%. The comparative ratios of 1950 and 1951 are 0.75% (net sales $1,060,033.34) and 8.65% (net sales $1,672,-731.35). This 1951 ratio of 8.65% compares with a 1942 ratio of 11.60% (on practically equal sales of $1,680,388.78) and a 1944 ratio of 12.65% (on smaller net sales of $1,438,421.83).

No dividend has been paid in the more than six years since the corporation was organized, during which time petitioner has regularly received a salary ranging from $35,000 to $18,000 (his agreed first year salary of $12,000 being raised after the resignation of the respondents) while respondents, of course, received nothing except the $2,000 paid to each prior to their resignations. At the same time the net worth of the corporation steadily increased, the surplus coming up from zero to about $130,000, or almost half of the capital stock, while the notes and accounts payable and total wages and salaries paid on the one hand, as well as inventory of goods for sale on the other, appear also to have become much larger, indicating no fear of business depression on petitioner's part or that of the other directors. The inventory for every one of the six corporate years was very much larger than that of any non-corporate year.

In early January of 1946, the petitioner wrote a letter to a third person, which, at least in the light of oral declarations made by him, is susceptible of the construction that in entering into the settlement in the preceding August and thereafter, he intended to use his power as majority stockholder arbitrarily to the prejudice of the respondents. The letter also referred to the respondents in defamatory terms such as "crooked." The mentioned oral declarations, testified to by former employees of the partnership and corporation other than the respondents, were to the effect that petitioner would see to it that no dividends would be paid so long as the respondents were stockholders, and indicated by the use of profanity strong personal ill will toward the respondents. There was also evidence of a declaration by him that he would not buy the stock of respondents for even a small fraction of its value or sell his own at any price.

The foregoing matters narrated as facts were in part controverted by petitioner, but on the whole were either uncontroverted, or, in effect, found by the jury to be true. The verdict included findings that the parties were partners just before the settlement was made; that petitioner made the settlement "with the intention of wrongfully excluding" the respondents "from the management, control, operation, and sharing of profits in the business"; that he "dominated and controlled the Board of Directors . . . from October 1946 to the present time, so that only the wishes, will and desires of T. W. Patton were adopted and carried into effect"; that he "wrongfully dominated and controlled the Board of Directors so as to prevent the declaration of dividends"; that he did this "for the sole purpose of preventing Nicholas and Parks from sharing in the profits to be derived

from the operation of the corporation" as well as "for the sole purpose of depreciating the value of the shares of the stock in said corporation, owned by Nicholas and Parks, to a lower value than such shares of stock would otherwise have"; that he was "guilty of mismanagement of the corporation" (mismanagement being defined in the charge as "bad, improper, or unskillful management, resulting in injury to the corporation") ; that he did *not* cause "the value of the inventory of the corporation to be written down to an amount lower than the actual inventory" for any of the corporate years: that the value of the inventory on August 31, 1951, was $513,910.79 (as against the smaller figures for earlier years and very much smaller ones prevailing prior to the incorporation) ; that petitioner "was acting with malice toward Nicholas and Parks" in the acts of mismanagement and domination of the Board of Directors; but that he did *not* cause himself to be paid an excessive salary in the years 1949 and 1950. The issue on actual damages called for a sum that "would fairly and reasonably compensate Nicholas and Parks for the acts, if any, of T. W. Patton, in mismanaging the corporation, his causing the inventories to be written down, if you have found that he did so, and the denomination, if any, of the Board of Directors, during the period from December 1, 1945, to September 1, 1950," but expressly limited these damages to "the depreciation in value, if any, of the stock" owned by respondents "and the loss of dividends, if any, that should have been paid during such period of time."

Issues were also submitted and answered favorably to the respondents concerning the matter of when they learned or by reasonable diligence could have learned of the wrongful intentions harbored by the petitioner at the time of the settlement. However, in the view we take of the case, these become immaterial.

Neither side has presented in this court a complaint as to the form of any issue described in the next to last paragraph above, or any conventional type of point attacking the answers for "no evidence," except that the petitioner, by counterpoint to the application of Nicholas and Parks, does explicitly contend that the findings of damages were unsupported by evidence and therefore properly disregarded by the courts below. However, petitioner's attack on the adverse portion of the judgments below, in the light of the points in his motion for instsucted verdict and otherwise in the trial court, has, we think, adequately questioned the corresponding portions of the verdict.

■ The theory of the respondents' case, as we see it, must be one for mismanagement of the corporation or misconduct in the handling of its affairs to their prejudice or that of the corporation itself or both. It cannot be regarded as an action of rescission for fraud. The respondents, while speaking repeatedly of fraud in the settlement agreement, expressly disclaim seeking rescission of that agreement. Nor can they, by coining expressions like "continuing fraud," make out the drastic remedy of liquidation they have obtained as being the same as if it were merely a matter of rescission of an agreement for misrepresentations. It may be doubted, though we do not need to decide it, that the respondents were actually misled into the settlement by an assumption on their part of the good faith of the petitioner, nor was any finding made or requested in this behalf. In any case, their real complaint is less that the petitioner misrepresented his true state of mind, than that he later and wrongfully suppressed dividends or mismanaged the corporation or both. Their undoubted assertion of a stockholder interest in the corporation as at present constituted, as well as their claim for damages due them as stockholders on account of the misdeeds of the petitioner as controlling stockholder, director and president of the corporation, is rather the opposite of a claim for rescission based on fraudulent misrepresentations in the settlement. For these reasons we attach little significance to the original state of mind of the petitioner *as a misrepresentation,* but rather regard it as important only in determining the true nature and legal consequences of his subsequent conduct. This is the only significance of the finding as to the concealed evil intent of the petitioner in the settlement negotiations, although the finding is supported by evidence.

As regards the other findings, and passing until later the matter of damages, we consider that of mismanagement in the sense of "bad, improper, or unskillful management, resulting in injury to the corporation" to be without support in the evidence. Even if the petitioner caused the books to be "juggled" so as arbitrarily to indicate low profits, or deliberately made excessive "charge-offs" of one kind or another so as to postpone showing otherwise normal profits, this still does not mean that the corporation was damaged, and we find no evidence otherwise that it was damaged. On the contrary, the specfic finding as to the reasonableness of the petitioner's salary indicates that it was not, while the above-mentioned evidence of accumulation of an almost 50% surplus during the corporate years is undisputed. That earnings and the ratio of profits to sales have been peculiarly unfavorable in comparison to the unincorporated years

is not of itself evidence of dishonest conduct or dangerously un-skillful management beyond the realm of managerial discretion (or indiscretion). And the jury found both the extraordinary inventory of 1951, as well as the much lower ones of previous corporate years, to have been correctly valued. The finding of general domination and control of the board of directors by the petitioner does not of itself connote damage to the corporation or even extreme irregularity in the corporate management. Being the founder of the business, president, owner of a clear majority of the stock and the only substantial stockholder on a board composed largely of employees, he could hardly avoid imposing his personal views on the other members, whatever his intentions.

But the finding of his control of the board for the malicious purpose of, and with the actual result of, preventing dividends and otherwise lowering the value (if meaning current sale value in the market place) of the stock of the respondents, is something else. Here the evidence as to the wrongful state of mind of the petitioner seems quite adequate, and while proof of connection between this state of mind and actual conduct is both small in volume and inferential in character (as it would almost necessarily be) we think it is enough. Obviously, the ability of the respondents to hold their stock or to sell it to third parties for a fair value would be lessened by the absence of dividends, and the above-mentioned statement of the petitioner about purchasing their stock could not unreasonably be interpreted as indicating a purpose to acquire it eventually for much less than its value. If it be difficult to say that there was manipulation of the books so as to hide profits, it is less difficult to infer manipulation of the business itself, so as to pile up profits in the form of property other than cash in order thus to excuse withholding dividends for lack of ready money. We do believe that, coupling all the circumstances indicating the petitioner's intent to eliminate the respondents from every connection with the business, and at an unfair sacrifice on their part, with the fact that no dividends were paid in the face of an accumulation of surplus (in the form of property and cash) at the rate of almost 10% per annum, the findings of malicious suppression of dividends must be sustained. Implicit in the verdict and implied findings so sustained is the conclusion that, but for the wrongful conduct of the petitioner and the corporation under his dominance, dividends in some substantial amount would have been declared, although there is no finding, express or implied nor any necessary conclusion to follow from the evidence as to just what amount would have been reasonable under all the circumstances.

■ Undoubtedly the malicious suppression of dividends is a wrong akin to breach of trust, for which the courts will acord a remedy. A minority stock interest is far from "change left on the counter" — to quote the petitioner's own written comment about the settlement. See Cates v. Sparkman, 73 Texas 619, 11 S.W. 846; Becker v. Directors of Gulf City Street Ry. and Real Estate Co., 80 Texas 475, 15 S.W. 1094; Hildebrand, Texas Corporations (1942 Ed.) Sec. 559; also the numerous other decisions hereinafter discussed.

But the character of the remedy is another question. In so far as sought in terms other than mere damages, it is necessarily of equitable cognizance, even where expressly recognized by statute. The petitioner contends that liquidation of a solvent corporation at the suit of minority stockholders is either wholly beyond the power of courts, or else, involving, as it does, the wasteful destruction by forced sale of a prosperous going concern, is wholly improper in cases like the present one, in which injunction or mandamus, at most, should be applied.

Our present state statutes (Arts. 1379-95, under the title dealing with private corporations, Art. 2293, concerning receiverships, and Arts. 6253 under the title of Quo Warranto) either deal only with insolvent corporations or omit anything approaching explicit reference to a situation like that before us. The provision in Art. 1387, "A corporation is dissolved: . . . 2. By a judgment of dissolution rendered by a court of competent jurisdiction," adds little light, even assuming, as we do, that dissolution and liquidation are essentially the same. The new and elaborate "Texas Business Corporation Act" (H.B. 16, Acts 54th Leg., reg. sess., 1955, Ch. 64), is not yet in effect, but we note with some interest that its approach to this type of case is one of "rehabilitation" in preference to dissolution or liquidation. See Arts. 7.05-7.09, especially par. A of 7.06.

The pattern of Texas decisions on the general subject is obscure. Our own language in the Cates and Becker cases, supra, especially the latter, seems to recognize a minority right to receivership in cases of gross or fraudulent mismanagement, although without particular reference to whether liquidation or something else is to follow. Similar language is found in decisions of the Courts of Civil Appeals such as Gibbons Mfg. Co. v. Milan, 17 S.W. 2d 844, 846-7; Prairie Lea Production Co. v. Tiller, 286 S.W. 638, and Berkshire Petroleum Corp. v. Moore, 268 S.W. 484, while Falfurrias Immigration Co. v. Spielhagen, 61 Texas Civ. App., 111, 129 S.W. 164, though ultimately deny-

ing the receivership on procedural grounds, declared it *and* liquidation to be a proper remedy in extreme cases of mismanagement, as did also Hammond v. Hammond, 216 S.W. 2d 630, in the course of dissolving a receivership. To the contrary effect may be cited other Civil Appeals decisions, including People's Inv. Co. v. Crawford, 45 S.W. 738; Williams v. Watt, 171 S.W. 266, 268; Toomey v. First Mortgage Trust Co., 177 S.W. 539, 541; Burnett v. Smith, 240 S.W. 1007, 1009; Yount v. Fagin, 244 S.W. 1036, 1039; and State v. Robinson, 42 S.W. 2d 457. The last mentioned decision, which is later than all of the others except Hammond v. Hammond, is to the effect that, even in cases of extreme mismanagement threatening insolvency, courts will not decree receivership and dissolution at the suit of private parties interested in the corporation. There a Lloyds type of insurance corporation was involved, and the State itself intervened to contest the appointment of a receiver, but the language employed clearly dealt with corporations generally, and may be said to have been approved by the Supreme Court through "refusal" of a writ of error in that case, and subsequent citation of it as authority in the course of the opinion in State v. Dyer, 145 Texas 586, 200 S.W. 2d 813. The opinion in the Dyer case also contains the quite pointed observation that courts under all circumstances approach the matter of judicial dissolution of corporations "with caution," although the actual holding is not closely in point here.

As to authorities from other jurisdictions, one much relied on by the respondents and the Court of Civil Appeals, Miner v. Belle Isle Ice Co., 93 Mich. 97, 53 N.W. 218, 17 L.R.A. 412, holds for receivership and liquidation, as a matter of general powers of an equity court, in a case where control of an evidently solvent corporation by the dominant stockholder-officer operated to deny dividends to the principal minority stockholder over a period of years as well as to cloak considerable piracy of corporate assets by the former. The court's statement as to the futility of trying to protect the minority against the probable future misconduct of an evidently wrong-minded person in control of a corporation carries considerable force. The semi-trustee status of directors and dominant stockholders is emphasized. This decision and the later one of the same court in Fleming v. Heffner & Flemming, 263 Mich. 561, 248 N.W. 900, appear to rest also on the ground that the stock was closely held, and the corporation thus somewhat analogous to a partnership. They also speak in terms of failure of the corporate purpose, which, of course, is that of making money for, and paying it to, all of the stockholders.

The Miner case was in turn much relied on in the widely cited Tower Hill-Connellsville Coke Co. v. Piedmont Coal Co. case (4 Cir.) 64 F. (2d) 817, 91 A.L.R. 648, which sustained a liquidation decree at the suit of an evidently large segment of the preferred stockholders of a solvent but unprosperous West Virginia corporation, who had received no dividends for many years and whose preferred interest in the net assets of the corporation was endangered by hazardous and arbitrary conduct of the officers and directors acting under the domination of a majority common stockholder group which likewise controlled other corporations and had transactions apparently for their own profit between these and the defendant corporation to the apparent prejudice of the latter. The court vigorously rejected the argument that liquidation was inferentially forbidden by a West Virginia statute affirmatively authorizing judicial dissolution or equitable grounds at the suit of one-fifth in interest of the stockholders. (Our own somewhat similar statute, Art. 1383, Vernon's Texas Civ. Stats. Ann., applies only in cases of insolvency.)

Both the Miner and Tower-Hill decisions expressly recognize that the judicial remedy of liquidation at the suit of private parties and in absence of express statutory authority is by way of rather special exception to "the general rule."

Somewhat more numerous are the decisions cited by the petitioner. Rizzuto v. Onset Cafe, Inc., 330 Mass. 595, 116 N.E. 2d 249, and Myers v. Occidental Oil Corp. (D.C. Del.) 288 F. 997, appear to deny the remedy of liquidation altogether except as it may be available by statute, although the Myers case seems qualified by the much later decision of the same court in Campbell v. Pennsylvania Industries, Inc., 99 F. Supp. 199 (1951), which denied receivership and liquidation under the particular facts but at the same time declared such a remedy to be available in equity in cases of acute danger to the corporation or failure of its essential purposes.

The decision of the New Jersey Court of Errors and Appeals in Laurel Springs Land Co. v. Fougeray, 50 N.J. Eq. 756, 26 A. 886, 887, while perhaps not shutting the door altogether on judicial liquidation of solvent corporations, does clearly reject that remedy in the particular case, although the corporation was small and closely held, and the continued failure to pay the complaining minority stockholder (or others) any dividends was due to misappropriation of corporate assets by the controlling stockholders and directors. The court met the problem

of future control of the errant majority, which so influenced the Michigan court in the Miner case, supra, by providing for a continuing supervision of the corporation by the trial court, although, as stated, without the intervention of a receiver. An interesting portion of the opinion is quoted in the footnote.[1]

Somewhat to the same effect as Campbell v. Pennsylvania Industries, Inc. supra, are Brennan v. Rollman, 151 Va. 715, 145 S.E. 260; Enterprise Printing & Publishing Co. v. Craig, 195 Ind. 302, 144 N.E. 542, 145 N.E. 309; Indianapolis Dairymen's Co-Op, Inc. v. Bottema, 226 Ind. 337, 79 N.E. 2d 399; First National Bank of Waterloo v. Fireproof Storage Bldg. Co., 199 Iowa 1285, 202 N.W. 14; and the Florida cases of Finn Bondholders, Inc. v. Dukes, 157 Fla. 642, 26 So. 2d 802, and Freedman v. Fox, 67 So. 2d 692. Most of these apparently recognize the remedy of liquidation, but refuse to apply it to the particular facts involved, even though, in some instances, these facts included outright dishonesty on the part of the parties in control of the corporation to the detriment of the corporation.

---

1.—"In the present case, the prayer of the complainant should be met by a decree requiring the defendants as directors to declare a dividend of all the net earnings not needed for the legitimate purposes of the company's business. And in order that the matter may remain under the scrutiny of the court, the decree directing the defendants to account and elect as to salary or commissions should be supplemented by requiring them to declare such reasonable dividends, and to do so from time to time as the financial status of the business may warrant, with leave to the complainant to apply to the court of chancery for relief in the premises if it be necessary for him so to do. Further the decree should not go. So much of it as appoints a receiver, and puts him in possession of the property of the corporation, and directs a transfer to the complainant of a part of its net assets, and a conveyance to him in fee of one-third of the unsold real estate must be reversed, as must also the injunction by which the business of the corporation was stopped. The frauds of these defendants as directors of this corporation are all capable of adequate remedy and complete redress by the court, within the principles of remedial and preventive equity. This being so, the court was not justified in stopping the business of a solvent company, and taking possession of its affairs for the mere purpose of aiding the withdrawal of the injured party with a proportionate share of the corporate property and its increment, assuming such jurisdiction to exist in any case in the first instance. In case of a contumacious disregard of its decrees, a court of equity has and may put forth powers of a compulsatory and punitive character greatly in excess of those exercised by it in its ordinary remedial jurisdiction. To justify the employment of these extraordinary powers, there should be, however, something more than an apprehension that the frauds redressed, or others of a like nature, will be repeated in the face of the decree forbidding them. The dismemberment of a corporation, even though it be a trading company, and the part distribution of its assets to a shareholder, who is permitted to withdraw under the protection of the court, coupled with the disturbance of corporate functions incident to a receivership, are extreme powers, and may not be decreed by a court of equity when the specific acts complained of are capable of redress and complete restitution, and those apprehended fall within the ordinary jurisdiction by injunction. The decree will be reversed without costs, and remitted to the court of chancery, in order that a decree may be entered in accordance with the views herein expressed."

■ Our conclusion is that Texas courts, under their general equity powers, may, in the more extreme cases of the general type of the instant one, decree liquidation and accordingly appoint a receiver under par. 4 of Art. 2293, Vernon's Texas Civ. Stats. Ann., for this purpose or the less drastic purpose of "rehabilitation." Our seemingly contrary attitude in connection with the above-mentioned Court of Civil Appeals decision in State v. Robinson may well have been due to the fact that the liquidation of a semi-public corporation such as an insurance company is a matter of peculiar cognizance of the State authorities charged with supervision of insurance and that the Attorney General opposed the receivership. The experience of most lawyers having a substantial business practice will include instances, particularly in the case of small and closely held corporations relatively free of the pressure of public opinion and beyond the reach of current inspection by the public authorities, in which liquidation is about the only adequate remedy for the abused minority stockholder. On the other hand we agree with the practically unanimous judicial opinion that liquidation of solvent going corporations should be the extreme or ultimate remedy, involving as it usually will, accentuation of the economic waste incident to many receiverships and most forced sales.

Wisdom would seem to counsel tailoring the remedy to fit the particular case. As suggested in Laurel Springs Land Co. v. Fougeray, supra, equity may, by a combination of lesser remedies, including exercise of its practice of retaining jurisdiction for supervisory purposes and reserving the more severe measures as a final weapon against recalcitrance, accomplish much toward avoiding recurrent mismanagement or oppresion on the part of a dominant and perverse majority stockholder or stockholder group. Such a policy, as distinguished from one of hard and fast rules for or against any particular type of remedy, appears to be consistent with most of the out of state decisions above discussed.

■ Our view as to proper application of this policy to the instant case entails eliminating the outright liquidation and receivership decreed below and substituting a new decree, which will probably give adequate protection to the respondents and at the same time afford both parties a chance to normalize their relationships. The decree will include a mandatory injunction requiring the corporation and the petitioner as its dominant officer and stockholder to declare and pay at the earliest practical date a reasonable dividend on the stock of the corporation. This means that the amount of such dividend shall be substantial

and shall take into consideration, as a strong factor in favor of greater size or amount, the amount of accumulated surplus of the corporation, the fact that the respondents have been wrongfully deprived of their dividends since the beginning, the more or less liquid or "current asset" character of the large inventory of presumably salable merchandise, as well as such other matters as have logical bearing. The respondents are further entitled to have the injunction provide for reasonable dividends to be thereafter declared annually from future profits of the corporation and from accumulated surplus, provided only that the payment of such dividends be not clearly inconsistent with good business practice. Necessarily, the determination of the amount of the first dividend to be declared will be made in the trial court, as will also be the case with subsequent dividends in the event of contempt proceedings against the petitioner or the corporation or both for violation of the injunction, or proceedings for receivership and liquidation as hereinafter stated. Notwithstanding our reversal of the instant judgment of liquidation, the new decree shall, in addition to its injunctive provisions, provide for the court to retain continuing jurisdiction of the cause for a reasonable period, not to exceed five years, for the more adequate and convenient protection of the rights of the respondents, and with the express provision that should the petitioner or the corporation or both be adjudged to have violated the injunction, or if, upon the motion of the respondents, or either of them, and due hearing, it shall be determined that the corporation has been in any manner operated with bad faith toward the decree or toward the respondents or either of them in their position of minority stockholders, the court shall without prejudice to its additional right to punish for contempt, forthwith appoint a receiver of the corporation, with instructions to liquidate it and distribute the net proceeds of said liquidation pro rata among the then shareholders. We regard this latter provision as fair and even necessary, considering the malicious character of the misconduct heretofore involved and the consequent possibility of its repetition. The court's continuing jurisdiction shall likewise permit of modification of its decree or even dismissal of the cause on account of changed conditions, such as, for example, acquisition by the petitioner of the stock of the respondents or vice versa, provided no bad faith on the part of the petitioner be involved.

■ There remains consideration of the application of the respondents to review the refusal of both courts below to enter judgment for the large actual and exemplary damages found by the jury as their compensation for deprivation of dividends

and decreased value of their stock. Since we reject their contentions on the merits, we will simply assume that they were properly raised below by cross assignment to the appeal of the petitioner instead of by formal appeal of the respondents.

Actually there could be no even temporary devaluation of the stock in the ordinary sense, since it evidently never had a market, and we are cited to no proof that by reason of the misconduct of the petitioner people who would otherwise have bought it, or loaned money on it, at a figure approaching its book value (or some other figure) would not do so. Moreover, since the respondents still own the stock, any such past "devaluation" is not a true loss because, particularly in the light of our decree, there is no certainty whatever that it will continue. And there is no actual loss because there is no evidence that the misconduct of the petitioner reduced the net worth of the corporation or that it resulted in a smaller present net worth than would otherwise have existed.

As to loss from nonpayment of dividends, this conceivably would have been real and borne close relationship to the amount of dividends that under normal conditions would have been declared, but only if the respondents had been compelled to sell their stock. Since they still own it and will, by our decree, obtain the dividends to which they are entitled, or will, by liquidation, obtain their pro rata part of all the net assets, including the surplus out of which any dividends would have come, they are clearly not entitled to recover what amounts to the same dividends or pro rata of the assets all over again by way of "damages" from the petitioner. This would be an unjust enrichment of the respondents.

The issue on damages was submitted on behalf of the respondents and they make no complaint as to its form. It was evidently designed to compensate them for their part of any actual loss to the corporation from the misconduct of the petitioner and to award them the actual amount of dividends they would have received but for such misconduct. Any other items of damage that might have been claimed were waived by the omission to include them or to complain that they were not included. Since there is no support in the evidence for the finding in so far as it may be based on loss to the respondents through loss to the corporation, and since the amount of the dividends to be paid cannot under the circumstances be a ground of damages, the finding must be disregarded.

■ It follows that the finding on exemplary damages must also be disregarded, there being no actual damages.

Since the issue as to a proper sum to be now declared as dividends is properly severable from the issues tried, we see no objection to a remand for trial of the former while disposing finally of the other aspects of the case at this time, as we do. Except for the one issue mentioned, the case has been developed elaborately and at considerable expense.

The judgments below are affirmed in so far as they deny the respondents money damages. In so far as they decree present receivership and liquidation of the corporation, they are reversed. The cause is remanded to the trial court for trial of the issues as to the proper amount of dividends to be now declared and paid by the corporation and entry of the corresponding mandatory injunction as to these and future dividends as hereinabove adjudged.

The costs incurred up to this time are taxed two thirds against the petitioner and one third against the respondents.

Opinion delivered June 1, 1955.