DRIVER *v.* PRODUCERS COOPERATIVE, INC.

5-2215                                    345 S. W. 2d 16

Opinion delivered March 27, 1961.

[Rehearing denied May 1, 1961.]

*Oscar Fendler,* for appellants.

*Henry J. Swift,* for appellees.

GEORGE ROSE SMITH, J. Producers Cooperative, Inc., is a farmers' association engaged principally in the operation of a cotton gin at Osceola. The three appellants were formerly members of the association and are now inactive preferred stockholders having a total investment of $29,444.08 in the association. They brought this suit against the association and its directors to compel the association to comply with its charter and by-laws (*a*) by paying dividends upon its preferred stock and (*b*) by establishing a revolving fund to be used for the retirement of preferred stock. After a protracted hearing upon the merits the chancellor dismissed the complaint, finding that in both matters complained of there had been no abuse of discretion upon the part of the directors. The correctness of that ruling is essentially the only issue upon appeal.

The co-op was organized in 1941 under the authority of Act 116 of 1921. Ark. Stats. 1947, Title 77, Ch. 9. The charter provides that membership is limited to persons actively engaged in farming. An applicant for membership is required to purchase one share of common stock, which has a par value of $10 and does not bear dividends. Each member is entitled to one vote at any meeting of the stockholders. If a member becomes ineligible to remain in the association, as by ceasing to farm, the association is entitled to redeem his common stock. The co-op is authorized to do business with non-members, who share in the annual distribution of net earnings.

The charter provides for the issuance of preferred stock, which "shall bear non-cumulative dividends not to exceed 5 per cent per annum, if earned and when declared by the board of directors; and such dividends shall have preference over any and all other dividends or distributions declared in any year." The preferred stock is without voting rights, is redeemable at par, and has priority over the common stock in the distribution of the assets upon a dissolution of the association.

Article X of the by-laws provides that after the close of each ginning season the directors shall have the books audited by a public accountant, whose report shall show the net earnings after all operating expenses (including depreciation) have been paid or provided for. The net earnings so determined shall then be distributed as follows:

(a) Not less than 10 per cent of the earnings shall be put in a general reserve until this fund equals 25 per cent of the outstanding capital accounts; thereafter the fund is to be maintained at that level.

(b) An amount not exceeding 5 per cent (as limited by the charter) of the outstanding preferred stock shall be set aside for the payment of dividends upon that stock. In the discretion of the directors these dividends may be paid by the issuance of additional preferred stock instead of in cash.

(c) The remaining net earnings shall be distributed to the patrons of the co-op, including non-members, in proportion to the amount of business done by the various patrons with the co-op during the fiscal year in question. In making this patronage distribution the association is to retain an amount equal to one dollar for each bale of cotton ginned during the season, and preferred stock is to be issued to each member for that part of his patronage so retained.

Article XI of the by-laws directs that after adequate capital has been provided for the association through amounts paid in and amounts retained from the patronage distribution, an amount of the oldest outstanding preferred stock equal to the amount of new preferred stock issued during the year shall be redeemed or retired. Thus the effect of Article XI is to create a revolving fund for the retirement of preferred stock.

When the cooperative association was organized in 1941 it raised about $14,000, mostly by borrowing money, with which to buy a gin and begin business. In the early years the annual patronage distribution was sometimes made at least partly in the form of preferred stock.

Apparently this procedure was adopted so that the co-op would have cash for working capital and for the payments upon its long-term debt. The appellants, who were then active members of the co-op, acquired their preferred stock holdings entirely through such distributions of stock in lieu of cash. In 1950, a year or two before the appellants ceased to be active members of the association, the practice of issuing preferred stock was discontinued. No such stock has been issued since that year. Almost two-thirds of the outstanding preferred stock (including recorded credits for which stock certificates have never been issued) is held by the appellant and by the appellee directors of the co-op.

In 1947 the association expanded its activities by constructing an alfalfa dehydrator. This venture proved to be a failure, as a blight curtailed the local production of alfalfa. In 1953 the manager of the co-op obtained from an attorney, James E. Hyatt, Jr., a written opinion as to the proper method of writing off the dehydrator loss, which had been kept separate from the ginning operations. In that opinion Hyatt discussed Article X of the by-laws, summarized above, and recommended that the association comply with it by setting up the general reserve and paying a small dividend upon the preferred stock before making the annual patronage distribution. The minutes reflect that the director considered Hyatt's letter at their July meeting in 1953.

The directors did not follow Hyatt's suggestion that Article X be complied with. Instead, beginning with the fiscal year ending April 30, 1954, the directors put into effect a method of distributing the annual net earnings that is the point of controversy in this case. The appellants contend that the new system discriminates against the preferred stockholders, in that no provision is made either for the payment of dividends upon that class of stock or for its retirement.

The profit sharing procedure challenged by the appellants is the subject of much testimony in the record. This evidence shows that when a farmer brings his

cotton in to be ginned he pays the co-op a fee for its services in ginning and baling the cotton. The patron retains his ownership of the cotton itself, but the co-op purchases the cotton seed—a valuable by-product of the ginning process. It is shown by the weight of the evidence that the co-op's fees for ginning and its payments for seed are fixed competitively and are substantially in line with the fees and payments of other gins in the vicinity of Osceola.

Most, if not all, of the gin's profits come from its disposition of the cotton seed rather than from its service charges for ginning. This particular cooperative gin disposes of its cotton seed through another cooperative association, Osceola Products Company, which operates a cottonseed oil mill. Membership in the oil mill co-op is limited to ginners, who are required to own stock therein. The oil mill processes and sells the seed brought in by its members. At the close of its fiscal year, which ends June 30, the oil mill distributes its net profits among its members.

Since 1953, when the challenged method of profit sharing was adopted, the directors of the appellee co-op have in effect voted to pay all its annual net earnings to the active patrons of the gin, the distribution being made in the form of a postseason payment upon the cotton seed that was brought in during the preceding year. Soon after June 30 in each year the co-op has received a substantial distribution of profits from the oil mill. The directors have been using these funds for the payment of what amounts to a bonus to the patrons of the gin. The amount of this bonus has varied from year to year, but it has always been high enough to result in the co-op's books reflecting only a small profit or even a loss upon the year's operations as a whole. In 1956, for example, the postseason payment was fixed at $6 a bale; a total of more than $16,000 was distributed. The books indicated a loss of about $8,000 for that year, but if the bonus had not been paid there would have been a profit about equal to the bookkeeping loss.

The appellants' grievance is so plain that it does not call for an extended discussion. They were active members of the co-op during its lean years. Owing to the co-op's pressing need for liquid capital the appellants and the other preferred stockholders received certificates of stock instead of cash as part of their return from the operation of the gin. In this way those stockholders accumulated an investment that exceeded $100,000 at the time of suit. The value of the co-op's assets was not an issue below, but one witness made an offhand estimate of $150,000, and the substantial worth of the property is also confirmed by the fact that the accounting charge to depreciation exceeds $10,000 a year.

Despite the fact that the preferred stockholders' interest in the co-op constitutes the major part of its capital, the method of allocating the profits that was adopted in 1953 excludes these stockholders from any return upon their holdings. The only dividend paid in recent years was a 3 per cent dividend declared in 1957, perhaps as a result of the institution of this suit. Article XI of the by-laws provides for the creation of a revolving fund for the retirement of preferred stock in the years after adequate capital has been accumulated. This revolving fund is to be used for the retirement of preferred stock in the order of its issuance, with new preferred stock being issued to current patrons of the gin as the old stock is redeemed. The co-op's continued failure to establish the revolving fund deprives the appellants of any assurance that their stock will be retired within the foreseeable future. Thus the preferred stockholders' investment is being used solely for the benefit of the active members, while the stockholders are denied dividends as well as redemption rights.

The chancellor was in error in finding no abuse of discretion on the part of the directors. The stockholders are plainly entitled to insist that the directors either comply with the provisions of the charter and by-laws or establish a valid reason for noncompliance. Here the appellees' proof falls short of excusing their

long-continued failure to pay dividends and to create the fund contemplated by Article XI of the by-laws.

The position taken by the directors, in their testimony and in their brief, is that the payment of the bonuses for cotton seed is necessary to enable the co-op to retain its patrons. But the proof does not support this argument. All that is actually shown by the evidence is that the policy of returning all the co-op's profits to its members *has been* an effective method of retaining their patronage. This is readily understandable, for the members of the co-op have the advantage of receiving all the profits from the gin, with no payment being made to the preferred stockholders for the use of the property constituting their investment in the enterprise.

It is not shown, however, that the co-op's present policy is essential to prevent the loss of its customers. There is no proof that any patron of the gin would take his cotton elsewhere if the annual bonus should be reduced by the amount needed for the revolving fund. The sole reason given for the directors' liberal practice of returning all the profits to the patrons is the pressure of competition, but no attempt is made to explain how other cotton gins in the county are able to compete with this co-op despite the fact that they presumably provide some return upon invested capital.

As a matter of fact, more than 80 per cent of this co-op's ginning business comes from its present directors, who have since 1953 paid to themselves more than 80 per cent of the bonuses. There is no suggestion of willful wrongdoing or of fraud. To the contrary, the directors have acted without concealment and in the evident belief that their policy was a proper one. But it must be observed that the ginning business which they are afraid of losing is largely their own patronage. This fact confirms our conclusion that the appellees' evidence fails to overcome the convincing prima facie case made by the plaintiffs' proof.

The appellants insist that upon remand they are entitled to a personal judgment against the directors for the total amount of all bonuses paid to themselves within the period of limitations immediately before the institution of this suit. We think, however, that relief should be given only as to payments made after the suit was filed. The appellants repeatedly disclaim any charge of fraud; they merely insist that there has been an abuse of discretion. In the circumstances it would be inequitable to reopen past transactions over a period of years, in view of the likelihood that the practice would have been discontinued if the plaintiffs had made their objections known earlier. It was so held in *Lillard* v. *Oil, Paint & Drug Co.,* 70 N. J. Eq. 197, 56 Atl. 254, 58 Atl. 188, where the stockholders' relief for the directors' payment of excessive salaries to themselves was limited to sums paid after the suit was brought. See also Fletcher, Cyclopedia of Corporations (Perm. Ed.), § 5874.

The appellants also take the position that the preferred stockholders are entitled to a full 5 per cent dividend in any year in which the co-op's net earnings, as determined under Article X, are sufficient to pay that amount. We do not agree. The charter provides for a non-cumulative 5 per cent dividend "if earned and when declared by the board of directors." Since the dividend must be earned *and* declared the directors unquestionably have some discretion in apportioning the net earnings between the preferred stockholders and the active members of the association. In such a situation it is not proper for the courts to usurp the directors' function by attempting to declare in advance just what dividend should be paid. Instead, the matter should be decided in the first instance by the directors, subject to a judicial review to determine whether they have acted in good faith and without an abuse of discretion. Fletcher, § 5325; *O'Neall Co.* v. *O'Neall,* 108 Ind. App. 116, 25 N. E. 2d 656; *Patton* v. *Nicholas,* 154 Tex. 385, 279 S. W. 2d 848.

The decree is reversed and the cause remanded for further development with respect to the fiscal years

ending after the institution of this suit, to the end that appropriate relief may be afforded to the plaintiffs with respect to the establishment of the revolving fund and the payment of dividends upon the preferred stock. The appellants are entitled to recover their costs, but their request for the allowance of attorneys' fees is denied.